We will hear from Mr. Saltzman when he is ready. Good morning, Your Honor. May it please the Court, my name is Michael Saltzman. I'm from Hughes, Hubbard & Reed, and I'm representing the plaintiff, Gabriel et al., on the merits appeal. What happened in the district court was way outside the bounds, unfortunately. It's apparent that the district court decided early on in the case who had the white hat, and everything else followed from that. Qualcomm... Well, if you had the white hat on trade secrets, you waited too long. You had noticed, didn't you? Well, I'm happy to jump right into the statute of limitations. What happened, let's talk about, there were two aspects. There was Mr. Kleist, and then there was Mr. Shanley. Let's talk first about Mr. Kleist. What happened there was that there was an email from January 2003, and the email was from Mr. Kleist to one of his engineers, Mr. DiCarlo, and said, hey, by the way, I noticed that one aspect of this PowerPoint I'm reading was a direct rip-off of something we were doing with Glenair. And the judge seized upon that sound bite in the email and said, aha, that was it. The clock started right then and there, and you're done. But what the district judge did, unfortunately, was he ignored something that happened only a minute or so after that in the deposition, because Mr. Kleist was asked about it and said, yeah, I guess I wrote that. But he also said, at the time, I did not think this was IP protected. And so, first, the district judge made the mistake of looking at one sound bite and not another sound bite. Second, the district judge decided that the word rip-off necessarily, and could only mean that Mr. Kleist believed that there had been wrongdoing and he had been injured by the wrongdoing. But didn't Gabriel start a renegotiation of the agreement and get a lawyer? In other words, they thought there was something there. Well, that was a year and a half later, those incidents. That's a completely separate set of circumstances. The judge made two alternate rulings. The other one had to do with Mr. Shanley. Mr. Kleist was out of the picture altogether at that time. But the patents were Gabriel's, not Kleist and Stanley's. No, of course. But the judge gave two alternate theories as to when the clock started. The January 2003 theory depended on this one sound bite, and Mr. Kleist tried to explain that, and his affidavit was excluded under the sham affidavit rule. But he was also deposed, right? In the deposition, his testimony seemed to back up the idea that at the time he believed that their technology had been taken, and then he was asked, well, why didn't you follow up on it? And he said, I don't know. I guess I'm a bad businessman. I mean, that was the deposition testimony, right? That was part of the deposition testimony. He also said, I did not believe that my rights, that it was IP protected at the time. Mr. DiCarlo also offered an affidavit in which he said he didn't actually remember this comment, but in fact, Mr. Kleist was wrong. And let me get to that aspect of the California statute. The California statute- But some people think IP protected means patents. And, of course, there is obviously trade secrets. Mr. Kleist was an experienced person. Well, let me- the real answer is, but that's for the jury to decide what that means, not for the district judge to decide. Did we review statute of limitations, question of law, question of fact? What is that? What's the standard review? Well, I think it can be two aspects. Clearly, there are jury questions in California, and generally, about the facts, the meaning of words, the inferences from depositions or any other testimony. The jury's entitled to decide that. And here, with respect to Mr. Kleist, the California law says you have to have known about- that you were injured or suspected, and you had a suspect that was caused by wrongdoing. And let me take another aspect of what's wrong with the Kleist analysis. The Kleist analysis also ignored the fact that his by-the-way comment led him to- was about a particular page in a PowerPoint. And we pointed to the two different pages of the PowerPoint where he seemed to have come to this mistake. And it was a trivial mistake. Because if Mr. DiCarlo read it, other people read it, we submitted four affidavits in total that say, Mr. Kleist just misread. It's not true. It's not there. He thought that what Qualcomm was doing was going to be broadcasting this data, the acquisition assistance data. But if you look at the two pages, and we pointed out what they are in the appendix, 4475 to 4476. On 4475, this is a discussion of point-to-point information conveyance. And on 4476, it's about broadcast. And the difference between those two pages shows that on 4476, there is no broadcasting of the acquisition assistance data. So, even though the California law says, start the clock running when you suspect that your rights have been infringed, it also says that you have a duty to make a reasonable investigation at that point. And our point to the district court, which was unfortunately completely lost on the court, was that it was a trivial suspicion. It was just an easy mistake. Mr. Salzman, you're running out of time. Can you go to your other hurdle, the September dealings with the Richmond Tribal Council? Right. Mr. Shanley was new to the company in the fall of 2004, summer of 2004. His company owed Qualcomm a bunch of money. Qualcomm said, well, we're prepared to renegotiate the deal, but we'd just like to cross this one little paragraph off. Don't worry about it. And that was the paragraph that said the work they were doing together would be shared. And so he hired a lawyer and he said, you know, what's up with this? As anyone would know. Let's just cross this out. There's no shared technology. There's no program technology. Let's cross it out. So he hired a lawyer to look into that. His deposition confirmed that. His deposition also confirmed, actually he said a bunch of things. The reality is Mr. Shanley's deposition was a little bit all over the place. Among other things, though, he also said quite clearly that all through the fall of 2004, what he was concerned about was the shared technology, had they taken our technology. And at 48-37, he said in his deposition, quote, at the time it was a claim of joint ownership of IP, no dollar amount. So the district judge picked and chose. There certainly are statements from which you could infer that he was suspicious of Qualcomm from soup to nuts. But there's also testimony in which he said at that time, no, no, looking back, and remember it was seven years from the date of his deposition back to when these events occurred. And so he said at one point you could infer general suspicion, but at other points he said no, it was just about this joint technology and it was really later when Mr. Angus in February and thereafter started actually studying the patents and into the spring and summer of 2005 that he became concerned that their own ideas had been taken. And all these statements that you say from Mr. Shanley help your argument, where are those located? In the deposition? In the deposition. In the deposition, well, the one I point to, there are multiple ones, but the one I just saw at 48-37, at the time it was a claim of joint ownership of IP. And objectively also you can look at two other pieces of data from that time. November 30th, 2004, so just before the December 17th tripwire date, that memo, it's an internal memo, and all it's about is shared technology. January 5th, letter from Mr. Shanley to Qualcomm, also focuses on the joint technology and we have rights, we think we have rights in it, we have claims. And then there was a meeting January 24th and 25th between Qualcomm and Gabriel and that discussion was about continuing collaboration and what rights did we have. There was no suggestion in that time period from those objective pieces of evidence that our people were suspicious that there were patents going on or anything like that, where their technology was taken and Mr. Angus offered an affidavit, as did Mr. Shanley, and the judge below said, I don't care what Angus says, he doesn't know, I don't care what Shanley says, that was filtered through a lawyer, but these were events from seven years earlier and it was just improper to take away from the jury and say, aha, here's a sound bite and we're done. Let me address the patent co-inventorship issue. You'll recall that there were six patents. We, the district judge, interpreted claims in several of those patents in ways that don't appear in at least some of the claims for each of the patents, read in limitations that Qualcomm invented and made, therefore, classic Phillips errors. The judge was starting from the proposition, and you can read it in his decision, these guys didn't invent anything, and the inference is very clear if you read between the lines, if you read the lines, that he just thought these people were fakers from beginning to end, they're not really engineers, not really capable of doing anything, and thereafter, going patent by patent, instead of doing a claim construction, if he wasn't going to adopt the plain meaning of claims, the district judge simply took snippets, a sentence or two from the Qualcomm brief that this is what the patent means, you didn't invent that thing, and therefore, they're gone, and those were errors one after another, just the procedure, I think, from this court's point of view, to have six patents, one sentence each, make the obviously wrong summary judgment statement that you have failed to prove by clear and convincing evidence that you're a co-inventor, and we have errors, there should, at a minimum, have been a Markman hearing, if the judge was going to do something, claim by claim, that was not the plain meaning of those claims. Thank you. Mr. Peterson? Thank you, Your Honor. May it please the court, my name is Tim Teeter, and I'm here for Qualcomm and Dr. Krasner today. I'd like to start with a few brief remarks about the statute of limitations and Mr. Shanley in particular. Now, what's remarkable here is it's undisputed that Mr. Shanley met with counsel and he said, I did suspect we had claims, that's in the red brief at 9 through 10, and Mr. Shanley asked counsel to investigate Trace's claim against Qualcomm in the fall of 2004, and the court noted that at Appendix A-39. He testified that he believed that Trace had a claim for joint ownership of IP, and in reply in their brief, what Gabriel argues here is that while he believed he had a claim, he thought he had a claim before the trigger date, but they say it was a different kind of claim. And Gabriel argues that Shanley suspected only a claim relating to joint ownership and relating to Qualcomm's use of program technology. Now, that's not clearly stated in his deposition testimony, but what I would submit is the difference is a distinction without a difference whatsoever. If we look at the claim that Gabriel actually pled in its complaint, every version of its complaint, we look at Count 8, the trade secret claim that the court dismissed at pages Appendix 653 through 654, we see that that claim, the trade secret claim, alleges the use of program technology and the misappropriation of it. Paragraph 151, locates confidential proprietary information as well as program technology, they say, derived independent value. And then they go through and they say that Dr. Krasner and Qualcomm misappropriated, locates confidential proprietary information as well as program technology by using it without locate consent. And the agreement itself said that the parties shall protect all program technology as a trade secret. So now why is that relevant? Well, Gabriel has said here that they admit in their briefs that Mr. Shanley had a suspicion and a concern about program technology. He felt that Qualcomm was misusing program technology, doing something with it that they shouldn't have. He thought that Gabriel had a claim for joint ownership of IP. And based on his testimony, it's one of two grounds, based on his testimony, the district court dismissed the claim based on the statute of limitations. And the claim that he dismissed is a claim that exactly covers what Mr. Shanley said he suspected in the fall of 2004 and exactly what Gabriel admits he suspected in the fall of 2004. So the question is, well, did he know exactly which type of claim? Did he know the legal import of it? It's really irrelevant. The district court properly granted summary judgment in either case. As the jolly case that we cite in our briefs points out, what's relevant are the facts, not the legal label that you might attach to the facts. If you know the facts, you have notice of the facts, then it doesn't matter whether you characterize it as one legal claim or another. And here, there's really no question. Now, with respect to Mr. Clise, Mr. Clise, in January of 2003, said, by the way, did you notice the broadcast mode for GSM, a direct ripoff of our work with Bonaire. And in their brief, Gabriel raises a new argument. And they say, well, ripoff might not be illegal. It might be a legal ripoff. And they say, it might be a legal ripoff, but it would cover, nonetheless, mimicking or copying ideas. They said this would be mimicking or copying ideas. So what Gabriel is admitting in the brief they filed in this court is, at a minimum, Mr. Clise felt that SnapTrack was mimicking or copying his ideas. And there's no question. They admit that he felt there was mimicking. They just say he didn't think it was illegal. Whether or not he thought it was, quote, illegal is really beside the point. Again, as the jolly case that we cite in our briefs points out, what matters is knowledge of the facts and notice of the facts. And at that time, in January of 2003, Mr. Clise felt that his work had been mimicked and copied, at a minimum. To frankly think that he felt it had been ripped off, and everybody knows what ripoff means, and they didn't raise this argument until the Court of Appeals. And again, if we look at the claim that the District Court considered and the claim that the District Court dismissed, what do we see? The claim refers to Gabriel's trade secrets and other proprietary information, including locates experience and expertise in the field of narrowband, including solutions to problems in the telecommunications industry. And the claim, this is paragraph 154 of their complaint, also addresses disclosing or using the information without locates consent. So what did Mr. Clise see in January of 2003? He saw that he believed that SnapTrack was, as they put it now, mimicking or copying information from their expertise in the field and their solutions to the telecommunications industry problems. And they were disclosing that information in a public PowerPoint without locates consent. By their own admission, Mr. Clise himself had noticed in January of 2003 of the very claim that they fled and the very same claim that the District Court dismissed. That's enough. And Mr. Clise said, quite candidly, I didn't think it was important. That's what he said. He didn't think it was important. That's what the statute of limitations is for. The statute of limitations is for exactly that kind of problem. Now I'd like to touch on the patents, because fundamentally this case is an inventorship case. It's an allegation of joint inventorship, and there were no errors here at the District Court level. None whatsoever. These patent allegations, there were six patents, five families, were easily resolved on summary judgment because there's no genuine issue, no evidence creating a genuine issue with respect to any of them. The first pair of patents, the related patents that Gabriel focused on below, was the 277639 patents. Now these patents, originally Gabriel couldn't identify anyone who was the alleged omitted inventor. We served discovery. They couldn't identify any alleged omitted inventor. Mr. Clise, who verified the interrogatory answers regarding inventorship, couldn't identify any alleged omitted inventor, didn't allege that he, in fact, was the omitted inventor. And what those patents cover is a particular solution or a particular advancement over prior cellular standards where you have two entities. You have a UE, user equipment, handheld device, and you have a network. And the patent claim expressly covers the interactions between the UE and the network. They're separate and different things. The summary of the invention explains that. The file history explains that. The file history and the reasons for allowance, the PTO expressly states that the reason for allowance is that none of the prior art showed a particular interaction between the mobile, or the UE, and the network. They're different entities. There's no dispute as to that. That's the only thing that's disclosed in the patent. What Gabriel argued was, well, we're going to mush the two entities together because Gabriel didn't locate, didn't have a user equipment handheld device that did anything even remotely like the invention. When we asked the inventors whether or not they had invented the method that was described in the patent and claimed in the patent, Mr. Clise said, and this is at page 5861 through 62, I didn't invent the idea of the target UE storing and sending a position estimate. That's the invention. Mr. Grant and Mr. Green also admitted, I didn't invent that, I didn't invent it. Their expert, Dr. Medvedevich, was unable to conclude that Locate possessed the invention in all the claims. Essentially, there was no evidence whatsoever of joint inventorship, none as to that patent. With respect to the 050 patent, that's a patent that deals with the tradeoff between transmitting voice in a cellular system and receiving GPS. That's a unique problem to voice cellular. In the 050 patent, you want to make sure that you can continuously transmit voice typically because you don't want to have a dropped call. The 050 patent deals with this tradeoff. When do I have little breaks in my voice transmission so that I can receive GPS? That is a totally fundamentally different problem than what you'd have in the paging industry. With a pager, you don't care if you have a little break. It doesn't matter. You're not trying to transmit continuously voice. Completely different issue. The claims expressly require microphones and voice transmission, and the PTO, in allowing the invention, said, hey, the key feature here is the absence of speech triggering a particular signal. We asked Mr. Clise whether he invented that. Mr. Clise didn't even think that it was possible to stop a voice transmission without dropping a call. He didn't even think it was possible. Initially, when we started discovery on Gabriel, asking who was the alleged inventor, originally they said nobody. Then they said, well, Mr. DiCarlo must be the inventor. Mr. DiCarlo, we asked him, are you the inventor? He said, no. We said, well, why were you listed as the inventor? He said, I don't know. I'm not the inventor. So Mr. Clise raised his hand, and he said, okay, I'll be the inventor. But at the end of the day, when I asked him about that at his deposition, I asked him about whether he was the inventor and why he didn't identify himself as the inventor in the first interrogatory response. He said, I'm going to pass on that one. I don't know the answer. I think patent lawyers can argue that one. And he admitted he wanted some recognition, but he couldn't really tell what in the patent, if anything, he thought of. As I said before, clearly he didn't even think it was possible to halt transmission of voice, which is essential to the claims and what the whole patent is about. He was just a modest fellow. Very, very modest, apparently, Your Honor. So if we look at the 958 patent, which is the next patent, the 958 patent is particularly remarkable. That one deals with user permissions to access someone else's location in the system. And in that patent, Gabriel guessed, and they put Mr. Grant as the original omitted inventor. But they had a problem. Grant joins LOCATE in 2000, and that was after SnapTrack had a complete draft of the patent application. SnapTrack had a complete draft of the patent application October 26, 1999, before Mr. Grant ever even showed up at LOCATE. He can't possibly be an omitted inventor. And you'll see the complete draft of the application at the appendix, page 6451 through 6482. Gabriel's brief inexplicably suggests that the application wasn't done for two years until October 2001, and that's their brief, blue brief at 22. And I would invite the panel to look at the application, appendix 6451 through 6482. It was finished. It was done. So faced with that, what did they do? But on this one, they ultimately landed on Kleist and Frosin. They did. They ultimately landed on Kleist and Frosin. That's absolutely right. And Mr. Kleist said in his deposition, well, the efforts to come up with this idea were kind of a group effort that included Grant. And we know that Grant arrived there too late, so even Mr. Kleist can't say for sure that he provided any innovative contribution before 2000 when Mr. Grant arrived. And they have two other problems. One problem is their alleged innovation, which is just the idea of access constraints. That idea, and if you look at the district court's opinion, A-10 at note 5, that idea was disclosed already in a prior art consumer research study, ironically funded by Qualcomm. So the idea that they say was their innovative idea, access constraints, that was in the prior art. That wasn't innovative either. 249 patent, this one is another remarkable patent. This one deals with a particular technique and a particular tweak to prior art cellular standards invented by Dr. Gall. Now, there's no evidence whatsoever. Dr. Gall wasn't at SnapTrack, didn't work on the project. He had no involvement whatsoever with the Locate project. There's no connection whatsoever. This is another case where they landed on Kleist as the omitted inventor. Mr. Kleist didn't understand the patent, thought it was a lot of jargon, never met Dr. Gall, no connection whatsoever. And Gabriel says, well, we should get to go to a jury anyway just on the pure surmise that despite the fact that we've had depositions of everybody and received 1.2 million pages of documents, none of which show any connection whatsoever between Dr. Gall and Mr. Kleist. And Mr. Kleist doesn't even understand the invention. We should nonetheless get to go to a jury. That's not evidence that can't clear the bar. They went over to DiCarlo and Green in that one. They went over to DiCarlo and Green. This is an interesting one. So they start with Kleist and they go to DiCarlo and Green. Then back in their summary judgment opposition, just Kleist and no mention of DiCarlo and Green. So it's a little unclear because it's a game of musical chairs who exactly they're arguing the inventor is right now. The district court recognized and acknowledged that DiCarlo and Green seemed to drop off in their opposition. We don't really know whether they would include them still, but neither of them had any real understanding or knowledge of what was going on in the 249 patent. The 249 patent is a very narrow tweak to prior art cellular protocols. It has nothing to do with what Gabriel did. Finally, the last patent is the 195 patent, which addresses automatically making an emergency call, which a pager cannot do without going through an intermediate server. The patent itself distinguished prior art that's just like the locate invention. The file history also distinguishes prior art that's just like the locate invention. There's no question that the claim also clearly requires the communication to go straight from the wireless device to the emergency response service. A pager can't do that. A cell phone can. That was the whole point. How clear is that claim? Where does it say it doesn't go through a server? So, good question. In the summary of the invention, we see the distinction between Williams and the Odenak patent. This is at A5825, the 195 patent distinguishing prior art. If we look at the claim itself, the claim itself says in response to said event reporting message communicating said event reporting message and said position information from said wireless mobile device, that's the handheld, to said emergency response service. And when you read that claim language in connection with the file history and in connection with the summary of the invention, where they're distinguishing this prior art, you know that they're trying to go directly without going through a server. That was what they thought the invention was. It's a very narrow, thin invention over the prior art. Very crowded field. They didn't have much, and so it's that razor that got them through. That's it. Thank you, Mr. Peter. Thank you, Your Honor. Mr. Salzman has a little bit of other things. About two and a half minutes. Thank you, Your Honor. First, let's talk about Mr. Shanley. Mr. Teeter suggested that it didn't matter what Mr. Shanley was suspicious of as long as he was suspicious. That doesn't make sense. That's not the law. He had a particular concern because someone was trying to rewrite his contract, and he was concerned about whether they were trying to, in effect, sell him the Brooklyn Bridge or something like that. They were just saying he wanted to know whether there had been shared technology. So it certainly did matter. With respect to Mr. Price, they completely ignore the California law that says if you suspect something, you have to conduct a reasonable investigation. And what did that consist of? And here, since it was just misreading a PowerPoint, the reasonable investigation is, hey, William, you've misread the page. And so the California law requires a reasonable investigation, but that obviously depends on the circumstance. Unlike what Qualcomm says in its brief that, well, you should do a patent search every time, that's not the law, and it would be bad law if instead of just saying this document doesn't say what you think it says, that you have to launch a patent search each and every time. For the patents, just as a base proposition, when this case started, none of those inventors worked for the company. So there was a process of finding what was what, and we did amend, and as you know, there's a statutory provision for correcting claims of this kind, and no inference should have been drawn from that, nor, I would suggest, should this court do so either. As you heard at the very end about the 195 patent, the claims don't actually say anything about having to go, or at least some of them, about going directly from a cell phone without going through a server. They just say from the device to the network. So that's an example of the 195 patent. With respect to the 050 patent, there are documents in the evidence specifically where he had the idea of flipping the order around and turning off the communicator so that the GPS can work, and that's in the record. He's disclaiming the part, and we are about voice, because it doesn't require voice, but it was that important idea of flipping around GPS versus the communication into the network. Where in the record is that? There are documents and all that. When I looked at the sites that you had in your brief on the 050, it said something about a passive antenna, and it didn't add up in my head. Why is that the invention? There's at least one document that shows the switch, switching between the two and arbitrating between the two, and there are other documents. I'm happy to give you the citations of where in the record the idea first originated, and it's quite early that the priority would go to the GPS over the communication for the system. I can give you those pages. I'm sorry I don't have it up at the podium with me, but there are. You're just relying on the sites in your briefs? Yeah, that's correct, and I'm happy to supply a letter with those pages. No, don't do that. But there are. Thank you, Mr. Sullivan. Okay, thank you, Your Honor. We'll take the case under review. Thank you.